1
2
3
4          UNITED STATES DISTRICT COURT
5             DISTRICT OF NEVADA
6  NICHOLAS V. MAESTAS,                    3:13-cv-00301-RCJ-WGC
7                          Plaintiff,      **REPORT & RECOMMENDATION OF**
                                           **U.S. MAGISTRATE JUDGE**
8       v.
9  STATE OF NEVADA, et. al.,
10                         Defendants.
11

12          This Report and Recommendation is made to the Honorable Robert C. Jones, United

13  States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to

14  28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4. Before the court is

15  Plaintiff's Motion for Summary Judgment. (ECF No. 47.)[1] Defendants filed a response and

16  Cross-Motion for Summary Judgment. (ECF Nos. 49/50.) Plaintiff filed a response to

17  Defendants' cross-motion. (ECF No. 52.) Defendants filed a reply in support of their motion.

18  (ECF No. 55.)

19          After a thorough review, the court recommends that Plaintiff's motion be denied and

20  Defendants' cross-motion be granted.

21                          **I. BACKGROUND**

22          At all relevant times, Plaintiff was an inmate in the custody of the Nevada Department of

23  Corrections (NDOC). (Pl.'s Am. Compl., ECF No. # 4.) He is a pro se litigant and brings this

24  action pursuant to 42 U.S.C. § 1983 concerning conduct that occurred while he was housed at

25  Lovelock Correctional Center (LCC). (*Id.*) Defendants are: Matt Wightman, Ramon Olivas and

26  Valaree Olivas. (*Id.*)

27

28

---

[1] Refers to court's electronic case filing (ECF) number.

1    In Count I, Plaintiff alleges that on May 10, 2011, Unit 3A was put on lockdown after

2    two inmates were arrested for fighting. (ECF No. 5 at 4.) On May 17, 2011, Plaintiff thought it

3    was unfair that he should be punished and placed on lockdown for the actions of other inmates.

4    (*Id.*) He wrote a grievance to this effect and concerning previous threats by Wightman. (*Id.*) On

5    July 28, 2011, Unit 3A was put on lockdown status again. (*Id.*) Plaintiff asserts that while touring

6    the unit, Wightman answered questions being asked by the inmates, such as whether they would

7    get showers. (*Id.*) Plaintiff then asked Wightman why he had to pay for someone else's actions,

8    and advised him that he had a grievance against him. (*Id.*) Wightman opened Plaintiff's cell

9    door. (*Id.*) Plaintiff said, "I have a grievance for you." (*Id.*) Wightman ordered Plaintiff to face

10   the wall, which Plaintiff did. (*Id.*) Plaintiff again said, "I've got a grievance for you." (*Id.*)

11   Wightman said: "That's it. You're done." Plaintiff alleges that Wightman then maliciously put

12   handcuffs on Plaintiff and said: "He's going to 4A." (*Id.*) Unit 4A is the "hole." (*Id.*)

13   In Count II, Plaintiff alleges that after he was put in segregation, Wightman retaliated

14   against Plaintiff for filing a grievance against him by writing a notice of charges against Plaintiff

15   for inciting a riot. (*Id.* at 5.) Eventually the charge was dismissed. (*Id.*)

16   In Count III, Plaintiff alleges that on June 3, 2012, he was in protective custody in Unit

17   3A with inmate Bell. (*Id.* at 6.) In that unit, there is no cell visiting, and Bell was not Plaintiff's

18   cellmate. (*Id.*) Around dinner time, Bell began following Plaintiff around the unit and attempted

19   to assault Plaintiff on the unit floor. (*Id.*) Plaintiff walked away with his hands over his head and

20   went toward his cell. (*Id.*) Bell tried to rush into Plaintiff's cell, but was prevented by another

21   inmate. (*Id.*) Plaintiff closed his cell door for thirty minutes, and came to the unit floor outside

22   his cell where Bell was waiting behind a pillar to ambush him. (*Id.*) Plaintiff saw Bell and asked

23   Bell to come out from behind the pillar and waived Bell toward his cell to find out what his issue

24   was. (*Id.*) Plaintiff went to his cell and told Bell to remain at the doorway. (*Id.*) Bell entered his

25   cell and attacked Plaintiff. (*Id.*) Bell then claimed to Ramon Olivas that Plaintiff had beaten him

26   up. (*Id.* at 7.)

27   On June 4, 2012, Plaintiff claims that Ramon Olivas retaliated against Plaintiff on behalf

28   of Valaree Olivas (whom Ramon Olivas is married to). (*Id.*) Plaintiff was in the process of suing

1   Valaree Olivas when Ramon Olivas filed the assault charge against Plaintiff regarding the

2   incident with Bell despite the fact that there was video surveillance to prove Bell was the

3   aggressor and Plaintiff's explanation that he acted in self-defense. (*Id*.) Plaintiff avers that

4   Ramon Olivas did not charge Bell, and Bell was released to general population while Plaintiff

5   was sent to lockdown in the hole for several months and was eventually charged $300. (*Id*.)

6   Plaintiff avers that Bell was put up to attacking Plaintiff by Ramon and Valaree Olivas to force

7   Plaintiff into lockdown and pressure him to settle his lawsuit against Valaree Olivas. (*Id*.)

8          In Count IV, Plaintiff alleges that on June 6, 2012, Valaree Olivas, in concert with

9   Ramon Olivas, retaliated against Plaintiff by keeping Plaintiff in administrative segregation

10  lockdown because he was suing Valaree Olivas. (*Id*. at 8.) Plaintiff had no holds that would have

11  kept him in lockdown, except for the "trumped up assault charge by Sgt. R. Olivas." (*Id*.) He

12  notes again, that Bell was not placed in lockdown. (*Id*.)

13         In Count V, Plaintiff alleges that on July 6, 2012, Valaree Olivas, in concert with Ramon

14  Olivas, retaliated against Plaintiff by keeping him in administrative segregation lockdown

15  because Plaintiff was suing Valaree Olivas. (*Id*. at 10.) He avers that on June 21, 2012, his

16  assault charge was reduced to G-6 (fighting), and he was given a thirty-day suspended sentence,

17  and was told he would get out of lockdown. (*Id*.) Then, at the time Plaintiff was to be released

18  from lockdown, Bell put Plaintiff on his "separatee" list, which prevented Plaintiff from being

19  released from lockdown. (*Id*.) Plaintiff alleges that a staff member must have told Bell about

20  Plaintiff being released, which caused Bell to put him on his "separatee" list. (*Id*.)

21         Plaintiff now moves for summary judgment as to Counts I and II. (ECF No. 47.)

22  Defendants oppose Plaintiff's motion and have filed a cross-motion for summary judgment as to

23  all counts. (ECF Nos. 49/50.)

24                            **II. LEGAL STANDARD**

25         "The purpose of summary judgment is to avoid unnecessary trials when there is no

26  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

27  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary

28  judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

(1986)). "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at

issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations,
> stipulations (including those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be

made on personal knowledge, set out facts that would be admissible in evidence, and show that

the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary:

(1) determining whether a fact is material; (2) determining whether there is a genuine dispute as

to a material fact; and (3) considering the evidence in light of the appropriate standard of proof.

*See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect

the outcome of the suit under the governing law will properly preclude the entry of summary

judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

"When the party moving for summary judgment would bear the burden of proof at trial, 'it must

come forward with evidence which would entitle it to a directed verdict if the evidence went

uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing

the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

*Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id.* Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is

1    merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-

2    50 (citations omitted).

3                                    **III. DISCUSSION**

4    **A. Retaliation Standard**

5           All of Plaintiff's counts allege retaliation. The standard for establishing retaliation is set

6    forth at the outset:

7           "Section 1983 provides a cause of action for prison inmates whose constitutionally

8    protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791

9    F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a

10   claim consists of five elements:

11          (1) An assertion that a state actor took some adverse action against an inmate (2)
            because of (3) that prisoner's protected conduct, and that such action (4) chilled
12          the inmate's exercise of his First Amendment rights, and (5) the action did not
            reasonably advance a legitimate correctional goal.

13   *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005))

14          "The First Amendment guarantees a prisoner a right to seek redress of grievances from

15   prison authorities as well as a right of meaningful access to the courts." *Id.* (citing *Bradley v.*

16   *Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

17          An inmate must submit evidence, either direct or circumstantial, to establish a link

18   between the exercise of constitutional rights and the allegedly retaliatory action. *Pratt*, 65 F.3d at

19   806-07. "[A] plaintiff must show that his protected conduct was the 'substantial' or 'motivating'

20   factor behind the defendant's conduct." *Brodheim*, 584 F.3d at 1271 (internal quotation marks

21   omitted, quoting *Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)). Timing

22   of the events surrounding the alleged retaliatory action may constitute circumstantial evidence of

23   retaliatory intent. *See Sorrano's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989). A

24   plaintiff's mere speculation that there is a causal connection is not enough to raise a genuine

25   issue of material fact. *See Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir.

26   1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary

27   judgment") (citation omitted).

28

                                        - 6 -

**B. Counts I and II**

Plaintiff moves for summary judgment as to Counts I and II. Defendants' have filed a cross-motion for summary judgment as to these counts, as well as the remaining counts. In Count I, Plaintiff alleges that Wightman retaliated against him by placing Plaintiff in the "hole" for filing grievances against Wightman. In Count II, Plaintiff alleges that Wightman retaliated against Plaintiff again for filing grievances against him by writing a notice of charges against Plaintiff for inciting a riot that was eventually dismissed.

Plaintiff contends that he filed a grievance against Wightman on May 17, 2011, for punishing him for the actions of other inmates. (ECF No. 47 at 3; Ex. C, ECF No. 47 at 20-34.) Then, on July 28, 2011, Plaintiff's unit was on lockdown again and all inmates were confined to their cells. (ECF No. 47 at 3; Ex. D, ECF No. 47 at 38; Pl.'s Decl., ECF No. 52/53 at 31.) Plaintiff asserts that during the lockdown, Plaintiff was complaining to Wightman through his cell door that he was being punished for the actions of another inmate. (ECF No. 47 at 3; Pl.'s Decl., ECF No. 52/53 at 31.) Wightman opened Plaintiff's cell door, and Plaintiff said: "I've got a grievance for you." (*Id.*) Wightman said, "get on the wall." (*Id.*) Plaintiff got on the wall, and said again, "I've got a grievance for you." (*Id.*) Wightman then yelled, "that's it, you're done." (*Id.*) He put Plaintiff in handcuffs and yelled, "he's going to 4A," which is the "hole." (*Id.*) Wightman took Plaintiff to administrative segregation and charged Plaintiff for inciting a riot because Plaintiff had complained about being punished for the actions of another inmate. (ECF No. 47 at 3; Ex. A, ECF No. 47 at 8-12.)

Defendants argue that there is no evidence that restraining Plaintiff and filing the notice of charges were done as a result of Plaintiff stating he had a grievance for Wightman. (ECF Nos. 49/50 at 8.) They assert that Plaintiff's claim that this is the case is entirely speculative. (*Id.*)

According to Defendants, on July 28, 2011, Plaintiff was housed in Unit 3A at LCC, and after threats against NDOC staff were made in the unit, the officers decided to conduct an administrative search of the entire unit. (ECF Nos. 49/50 at 2; ECF No. 49-2; Wightman Decl., ECF No. 49-2 ¶ 3.) While officers were conducting the search, Plaintiff asked Wightman why the entire unit was being held responsible for the actions of one inmate. (ECF Nos. 49/50 at 2,

1  Wightman Decl., ECF No. 49-2¶ 4.) He claimed the officers could not lockdown the entire unit

2  on this basis. (*Id*.) During the interaction, Plaintiff continued to raise his voice, quoting NDOC

3  Administrative Regulations (ARs) and legal terms. (*Id*.) Wightman was under the belief Plaintiff

4  was attempting to gather support from other inmates on the tier to rebel against staff. (*Id*.)

5        Wightman recognized the seriousness of the unit search and volatility on the tier during

6  the search. (ECF Nos. 49/50 at 2; Wightman Decl., ECF No. 49-2 ¶ 5.) Wightman believed

7  Plaintiff's behavior was a threat to security and that Plaintiff was attempting to incite others to

8  rebel. (*Id*.) As a result, Wightman restrained Plaintiff and placed him in Unit 4A (administrative

9  segregation) pending a disciplinary hearing and for the safety and security of the unit. (ECF Nos.

10 49/50 at 2; Wightman Decl., ECF No. 49-2 ¶ 6.) Wightman issued a notice of charges for

11 inciting a riot against Plaintiff, along with a report. (*Id*.; Ex C, ECF No. 49-3.)

12       On September 1, 2011, a disciplinary hearing was held. (ECF Nos. 49/50 at 3; Ex. E,

13 ECF No. 49-5.) The officer found Wightman's statement to be an accurate account of events;

14 however, the facts did not fulfill the elements of inciting a riot under the ARs, and Plaintiff was

15 found not guilty. (*Id*.)

16       Plaintiff asserts that the fact that the prison was on lockdown with each of the inmates in

17 their cells refutes Wightman's claim that he had a legitimate penological interest in restraining

18 Plaintiff and placing him in segregation. (ECF Nos. 52/53 at 4.)

19       Defendants contend that Plaintiff merely speculates that Wightman took these actions

20 because of grievances filed and a potential future grievance Plaintiff might file, but has not

21 presented  evidence to rebut that Wightman took his actions because of Plaintiff's behavior in the

22 unit at the time. (ECF No. 54 at 3.) They point out that Plaintiff does not dispute that he raised

23 his voice, and quoted ARs and utilized legal terms, which caused Wightman to believe Plaintiff

24 was attempting to garner support of other inmates on the tier to rebel against staff. (*Id*. at 4.)

25       In response to Plaintiff's motion and in support of their cross-motion, Defendants focus

26 on the legitimate penological interest element of Plaintiff's retaliation claims. They provide the

27 declaration of defendant Wightman, who says that the reason he restrained Plaintiff, took him to

28 administrative segregation and issued a notice of charges was because  Plaintiff's behavior,

1  coupled with the volatility present on the tier at that time presented a safety and security risk.

2  The unit was on lockdown because threats had been made against correctional staff. Plaintiff

3  does not dispute Wightman's description of his behavior.

4      Plaintiff's response to the asserted legitimate penological interest advanced by

5  Wightman's is that the unit was on lockdown with all inmates in their cells, implying there was

6  no safety and security risk. This fact that inmates are in their cells does not negate a risk of

7  increasing tensions in an already volatile situation. As a result, the court does not find Plaintiff

8  has raised a genuine dispute of material fact as to the legitimate penological interest element of

9  Plaintiff's claim. Plaintiff presents no other evidence that Wightman's conduct was not taken to

10  advance a legitimate penological interest.

11      As a result, the court recommends that Plaintiff's motion for summary judgment be

12  denied, and that Defendants' cross-motion for summary judgment be granted as to Counts I and

13  II.

14  **C. Counts III, IV, V**

15      **1. Count III**

16      In Count III, Plaintiff alleges that on June 3, 2012, inmate Bell began following Plaintiff

17  in an attempt to assault Plaintiff. There was eventually a confrontation between Plaintiff and

18  Bell, where Plaintiff claims Bell attacked him, but Bell told Ramon Olivas Plaintiff was the

19  aggressor. On June 4, 2012, Plaintiff contends that Ramon Olivas retaliated against Plaintiff on

20  behalf of his wife, Valaree Olivas, whom Plaintiff was suing. Plaintiff claims that Ramon Olivas

21  filed an assault charge against Plaintiff even though video surveillance would prove Bell was the

22  aggressor. Bell was not charged, and Plaintiff was charged, found guilty, and sent to lockdown

23  for several months.

24      Defendants acknowledge that Ramon Olivas and Valaree Olivas are married, and that

25  Plaintiff had previously sued Valaree Olivas and R. Olivas knew of the other unrelated litigation.

26  (ECF Nos. 49/50 at 11.)

27      Defendants contend that on June 4, 2012, another inmate (Bell) informed an infirmary

28  officer that he needed to speak to the sergeant or lieutenant on duty, and Ramon Olivas spoke to

1   Bell. (ECF Nos. 49/50 at 3; R. Olivas Decl., ECF No. 49-6 ¶ 4.) Bell informed Ramon Olivas

2   that he had not fallen and injured himself as he previously reported, but he had been called over

3   by the inmate who lived in cell 34 to talk, and upon entering the cell was attacked. (*Id.*) Ramon

4   Olivas reviewed surveillance footage for the relevant time period and it clearly showed an inmate

5   gesturing to another inmate on the tier with his hands. (ECF Nos. 49/50 at 3; R. Olivas Decl.,

6   ECF No. 49-6 ¶ 5.) Ramon Olivas did not recognize the inmates involved, and asked another

7   officer to identify the inmates. (*Id.*) The officer identified Plaintiff as the inmate making the hand

8   gestures to the other inmate. (*Id.*) When Ramon Olivas interviewed Plaintiff, he asked what the

9   fight was about. (ECF Nos. 49/50 at 3; R. Olivas Decl., ECF NO. 49-6 ¶ 6.) At first, Plaintiff was

10  not cooperative and denied involvement in a fight. (*Id.*) Ramon Olivas informed Plaintiff he had

11  heard the other inmate's story, and asked Plaintiff for his explanation. (*Id.*) Plaintiff simply

12  stated that he had to defend himself. (*Id.*) Plaintiff had no visible injuries. (*Id.*)

13       Ramon Olivas believed Plaintiff had assaulted the other inmate based on the other

14  inmate's statements and injuries, and the video footage. (ECF Nos. 49/50 at 4; R. Olivas Decl.,

15  ECF No. 49-6 ¶ 7.) Plaintiff was informed he would be placed in administrative segregation

16  pending a notice of charges for assault. (*Id.*) At his June 21, 2012 disciplinary hearing, Plaintiff

17  pled guilty to the charge of fighting, and was given a suspended sentence. (ECF Nos. 49/50 at 4;

18  Ex. G, ECF No. 49-8.)

19       In his opposition to Defendants' cross-motion, Plaintiff states that he disputes the

20  contents of the video surveillance. (ECF Nos. 52/53 at 2.) He maintains that the video

21  surveillance shows Plaintiff putting his hand up in a stopping gesture as Bell charged Plaintiff

22  into his own cell. (*Id.*) He also disputes that he denied a fight occurred. (*Id.*) Plaintiff contends

23  that because Plaintiff claimed self-defense, both Plaintiff and Bell should have been charged.

24  (ECF Nos. 52/53 at 5.)

25       Plaintiff's claim about the video surveillance is contradicted by his own allegations in his

26  complaint, where he specifically states: "Maestas saw Bell was waiting to ambush him and

27  *requested Bell come from behind the pillar and waived Bell to his cell to find out Bell's issue.*"

28

1    (ECF No. 5 at 6, emphasis added.) The court has viewed the video, and also interprets Plaintiff's

2    hand gesture as clearly motioning for Bell to come into his cell. (Defs.' Ex. M, filed manually.)

3           Regardless of the parties' interpretation of the video evidence, there is no evidence in the

4    record that Ramon Olivas wrote the notice of charges and had Plaintiff placed in administrative

5    segregation because of the litigation involving his wife, Valaree Olivas. That is entirely

6    speculative on Plaintiff's part. Instead, the evidence in the record demonstrates that Bell reported

7    to Ramon Olivas that his injuries were a result of Plaintiff's actions. Ramon Olivas observed

8    Bell's injuries. Ramon Olivas then reviewed the video footage, which he interpreted as showing

9    Plaintiff motioning for Bell to come toward his cell. Ramon Olivas interviewed Plaintiff about

10   the incident, and Plaintiff's only explanation was self-defense. Ramon Olivas observed that

11   Plaintiff had no injuries. On the basis of his interview with Bell, Bell's injuries, and his interview

12   with Plaintiff, Ramon Olivas determined Plaintiff was the aggressor and wrote the notice of

13   charges, and Plaintiff was placed in segregation. There is absolutely no discernible connection

14   between this series of events and the separate litigation Plaintiff was pursuing against Valaree

15   Olivas. The fact that Bell was not also charged with fighting lends no support to Plaintiff's claim

16   that Plaintiff being placed in segregation and issued a notice of charges is related to the litigation

17   against Valaree Olivas.

18          As a result, the court recommends that summary judgment be granted in Defendants'

19   favor as to Count III.

20          **2. Counts IV and V**

21          In Count IV, Plaintiff alleges that on June 6, 2012, Valaree Olivas, in concert with

22   Ramon Olivas, retaliated against Plaintiff by keeping Plaintiff in administrative segregation

23   lockdown because he was suing Valaree Olivas. In Count V, Plaintiff alleges that on July 6,

24   2012, Valaree Olivas, in concert with Ramon Olivas, retaliated against Plaintiff by keeping him

25   in administrative segregation lockdown because he was suing Valaree Olivas. (*Id*. at 10.) He

26   avers that on June 21, 2012, his assault charge was reduced to G-6 (fighting), and he was given a

27   thirty-day suspended sentence, and was told he would get out of lockdown. (*Id*.) Then, at the

28   time Plaintiff was to be released from lockdown, Bell put Plaintiff on his "separatee" list, which

1  prevented Plaintiff from being released from lockdown. (*Id.*) Plaintiff alleges that a staff member

2  must have told Bell about Plaintiff being released, which caused Bell to put him on his

3  "separatee" list. (*Id.*)

4        According to Defendants, Plaintiff was placed in administrative segregation while the

5  investigation regarding the altercation, Plaintiff's safety, the other inmates' safety and the

6  institution's safety could be completed. (ECF Nos. 49/50 at 13.) On June 22, 2012, Caseworker

7  Belanger updated Plaintiff's case notes regarding his June 21, 2012 disciplinary hearing. (ECF

8  Nos. 49/50 at 4; Ex. H, ECF No. 49-8 at 12.) The notes entered at 2:00 p.m. reflect that Plaintiff

9  was found guilty of a G6 charge, and his sanction was suspended and he could return to the

10  protective segregation yard at LCC. (*Id.*) Caseworker Belanger updated the notes at 2:45,

11  indicating that the caseworker directed officers to speak with inmate Bell. (*Id.*) The notes reflect

12  that Plaintiff would not be able to move back to Unit 3A based on inmate Bell's statements that

13  he was not comfortable having Plaintiff back in his unit and wanted to add Plaintiff as a

14  "separatee." (*Id.*) A "separatee" is defined in AR 522 as inmates that need to be separated from

15  other inmates due to enemy relationships or other special reasons. (ECF Nos. 49/50 at n. 4.)

16  Inmate Bell requested to have Plaintiff listed as a "separatee" because he was afraid of Plaintiff.

17  (ECF Nos. 49/50 at 4; Ex. I, ECF No. 49-9.) On July 6, 2012, Plaintiff was informed he would

18  not return to unit 3A and would remain in administrative segregation until appropriate housing

19  was available. (ECF Nos. 49/50 at 5; ECF No. 5 at 11.)

20        Defendants assert that there is no evidence to establish that the litigation against Valaree

21  Olivas had anything to do with this notice of charges or Plaintiff's placement in administrative

22  segregation, and Plaintiff's contention that this is the case is purely speculative. (ECF Nos. 49/50

23  at 11.)

24        Defendants state that regardless of Plaintiff's allegations that there was additional

25  surveillance footage that would establish a pattern of Bell stalking Plaintiff, Ramon Olivas based

26  his decision to file the notice of charges on the video footage he reviewed, Bell's injuries and

27  statement. (ECF Nos. 49/50 at 12.)

28

1    The court finds that there is no evidence in the record demonstrating that Plaintiff was

2  kept in administrative segregation following the incident with inmate Bell because of the

3  litigation Plaintiff was pursuing against Valaree Olivas. Plaintiff was initially placed in

4  administrative segregation pending the investigation and notice of charges regarding the incident.

5  After the hearing, his caseworker initially determined he would be placed back in protective

6  segregation. Within an hour of that determination, the caseworker noted that officers had spoken

7  to Bell, who wanted to list Plaintiff as a "separatee," which would preclude Plaintiff from

8  returning to that unit. There is no evidence that either Ramon or Valaree Olivas had anything to

9  do with Bell's decision to list Plaintiff as a "separatee." Plaintiff was advised he would remain in

10  administrative segregation while his housing assignment could be determined.

11    With no evidence linking Plaintiff's housing status with Plaintiff's litigation against

12  Valaree Olivas, the court recommends that summary judgment be granted in Defendants' favor

13  as to Counts IV and V.

14  ## IV. RECOMMENDATION

15    **IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING**

16  Plaintiff's Motion for Summary Judgment (ECF No. 47), and **GRANTING** Defendants' Cross-

17  Motion for Summary Judgment (ECF No. 50).

18    The parties should be aware of the following:

19    1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

20  this Report and Recommendation within fourteen days of receipt. These objections should be

21  titled "Objections to Magistrate Judge's Report and Recommendation" and should be

22  accompanied by points and authorities for consideration by the district judge.

23    2. That this Report and Recommendation is not an appealable order and that any notice of

24  appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed

25  until entry of judgment by the district court.

26

27  DATED: December 8, 2015.

28                                    _____
                                          WILLIAM G. COBB
                                          UNITED STATES MAGISTRATE JUDGE

- 13 -